**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| GARNIER-THEIBAUT, INC., | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-17-3632 |
| CASTELLO 1935 INC., ET. AL., | * | |
| Defendants. | * | |

**MEMORANDUM OPINION AND ORDER**

Defendants Castello 1935 Inc. ("Castello") and Richard William Campbell ("Campbell") entered into a contract to manufacture napkins and tablecloths for a Maryland hotel. Plaintiff Garnier-Theibaut, Inc. ("GT") alleges those napkins and tablecloths embodied direct copies of GT's copyrighted design. Accordingly, GT filed this litigation on December 7, 2017. Compl., ECF No. 1. It brings four counts against Castello and Campbell: Copyright Infringement (Count I), Impoundment and Destruction (Count II), Trade Dress Infringement (Count III), and Interference with Business Expectancy (Count IV). Am. Compl., ECF No. 16. Defendants have filed a motion to dismiss all of plaintiff's claims. Defs.' Mot., ECF No. 17. Because GT adequately pleads all of its claims, defendants' motion will be denied. Defense counsel Eric Menhart's motion to withdraw his appearance will be granted. Defendant Castello must retain counsel as this case proceeds. *McGowan v. Cross*, 991 F.2d 790 (Table), 1993 WL 125416, at *1 n.1 (4th Cir. 1993) ("Corporations and partnerships, as artificial entities, may not appear pro se but must instead appear through counsel."). Defendants will answer the Amended Complaint by June 7, 2018 and I will then hold a Federal Rule of Civil Procedure 16 telephone conference.

1

**Background**

Plaintiff GT, a New York corporation, and defendant Castello, a Virginia business entity, are both engaged in manufacturing and distributing linens for use in the hospitality industry.[1] Am. Compl. ¶¶ 4–5. In 2017, Castello, through defendant Campbell, an officer of Castello, entered into an agreement with The Hotel at UMCP ABC, LLC (the "Hotel") to manufacture and sell napkins and tablecloths to the Hotel. Am. Compl. ¶¶ 5–6, 15. The Hotel initially planned to award this contract to GT, but awarded it instead to defendants because defendants agreed to directly copy the designs of GT's linens, which are protected by copyright, for a less expensive price. *Id.* ¶¶ 6, 15. The focus of this litigation is defendants' copying of GT's copyrighted design. *Id.* ¶ 15.

GT owns a federal copyright in a visual work ("Organic") that is used in the weaving of textiles, including dinner napkins and tablecloths sold to businesses within the hospitality industry. *Id.* ¶¶ 2, 4. The copyright registration on "Organic" (No. VA 2-072-446) became effective on October 24, 2017. *Id.* at Ex. A. "Organic" was created and first published by GT in 2007 for use in its high-end linen collection and is described as "a bold pattern of unique irregularly sized rectangular fields enclosing fitted, curved elements evocative of tribal or aboriginal works." *Id.* ¶¶ 7–8. "Organic" can be reproduced in any color or any material and can be used as a single piece or in multiple copies of the weave. *Id.* ¶ 8. GT uses Jaquard weaving to manufacture linens bearing the "Organic" visual work. *Id.* ¶ 9. These linens containing the "Organic" design are referred to as the "Organic Products." *Id.*

GT offered its Organic Products to the Hotel for sale, a contract worth approximately $134,669.85. *Id.* ¶ 15. Castello, however, received the contract instead by directly copying GT's

---

[1] Because this case is at the motion to dismiss stage, the facts are as stated in GT's Amended Complaint.

Organic Products and selling them to the Hotel, through Campbell, at a lower price than the price quoted by GT. *Id.* ¶¶ 15–17. Campbell, on behalf of Castello, first met with the Hotel in 2017. *Id.* The Hotel provided Campbell with one of GT's original products bearing the "Organic" design, and Campbell advised the Hotel that Castello could copy the design and offer the linens at a lower price than GT. *Id.* Defendants were aware at the time they agreed to copy the design that it was protected by copyright. *Id.* ¶ 6. In fact, Castello's agreement with the Hotel contains a provision shifting the liability for copyright infringement to the Hotel. *Id.* Castello continues to use the copied design to advertise items for sale to others. *Id.* ¶ 15.

GT filed its initial complaint on December 7, 2017. Compl., ECF No. 1. Consistent with the order that I issued at the start of this case governing the filing of motions, ECF No. 6, a pre-motion status conference was held on January 16, 2018, resulting in an Order permitting GT to file an amended complaint and permitting defendants to file a motion to dismiss. ECF No. 14, 15. GT filed its amended complaint on January 26, 2018. Am. Compl., ECF No. 16. Defendants have moved to dismiss. Defs.' Mot., ECF No. 17.

## **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). To that end, the Court bears in mind the requirements of Fed. R. Civ. P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must

3

contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79. *See Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although at this stage of the proceedings, I accept the well pleaded facts alleged in GT's Complaint as true, *see Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011), when reviewing a motion to dismiss, I "may consider documents attached to the complaint," such as the copyright registration, "as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013); *see CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

## Discussion

### Count I: Copyright Infringement

The Copyright Act confers on the copyright holder "'exclusive' rights to use and to authorize the use of his work." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S 417, 432–33 (1984)). The holder's rights include distribution and performance or display of the original, reproduction of the original, and production of derivative works. 17 U.S.C. § 106; *id.*; *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994). Additionally, the Copyright Act provides that "anyone who

4

violates any of the exclusive rights of the copyright owner…is an infringer of the copyright." 17 U.S.C. § 501(a). To establish a claim for copyright infringement under the Copyright Act, a plaintiff must show two things: (1) it owned a valid copyright, and (2) the defendant(s) encroached upon the rights conferred by copyright ownership. 17 U.S.C. § 501(a); *Peiffer*, 21 F.3d at 571.

At issue in this case is the validity of GT's copyright.[2] Defendants contend GT does not have a valid copyright on the "Organic" design because the design is embodied on "useful articles" which are not protected under copyright law, the design is unoriginal, and GT has not established ownership of the copyright. To claim a valid copyright, GT must show the design is both (1) original and (2), in the case of a useful article, physically or conceptually separable from the utilitarian aspects of the item. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 429 (4th Cir. 2010). Additionally, GT must show ownership of the copyright. *Id.* at 428. A plaintiff can rely on the certificate of copyright registration as prima facie evidence of validity, provided the registration was made before or within five years after the first publication of the work. 17 U.S.C. § 410(c). GT, however, cannot rely on its certificate of registration because the first publication of "Organic" was in 2007 while its registration was not issued until 2017. Am. Compl. at Ex. A.

First, GT must show the design is original, which "implicates only a light burden" satisfied by showing "the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Collezione Europa USA, Inc.*, 618 F.3d at 430 (citations and internal quotation marks omitted). A "slight

---

[2] Defendants, in their motion, do not deny that their actions would constitute infringement of GT's copyright if GT's copyright is valid.

amount" of creativity is sufficient to establish originality; "[t]he vast majority of works make the grade quite easily, as they possess some creative spark." *Id.*

GT's Amended Complaint sufficiently alleges the "Organic" design is original. GT claims it created the design independently, either on its own or through work for hire. Am. Compl. ¶ 20. Additionally, GT's description of the design as a "bold pattern of unique irregularly sized rectangular fields enclosing fitted, curved elements evocative of tribal or aboriginal works" makes it plausible that "Organic" possesses "at least some minimal degree of creativity. *Id.* ¶ 8; *see Collezione Europa USA, Inc.*, 618 F.3d at 430.

Second, because a useful article[3] is at issue, GT must show the useful article is eligible for protection under copyright law as a pictorial, graphic, or sculptural work by showing the item "incorporates pictorial, graphic, or sculptural features that can be identified separately from and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101. This is known as the "conceptual separability test." In analyzing conceptual separability, the Fourth Circuit has cited favorably to this description of the test from the Seventh Circuit:

> Conceptual separability exists…when the artistic aspects of an article can be conceptualized as existing independently of their utilitarian function. This independence is necessarily informed by whether the design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences. If the elements do reflect the independent, artistic judgment of the designer, conceptual separability exists. Conversely, when the design of a useful article is as much the result of utilitarian pressures as aesthetic choices, the useful and aesthetic elements are not conceptually separable.

*Collezione Europa USA, Inc.*, 618 F.3d at 432–33 (quoting *Pivot Point Int'l, Inc. v. Charlene Prods.*, 372 F.3d 913, 931 (7th Cir. 2004)).

---

[3] A useful article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. Napkins and tablecloths, at issue in this dispute, fall within this definition.

Assuming the facts alleged in the Amended Complaint are true, it is plausible the "Organic" design is conceptually separable from the linens on which it appears. GT alleges that the Organic Products contain "non-functional design elements" and that the "Organic" design can be reproduced on any surface, suggesting its existence is not tied to the linens. Am. Compl. ¶ 11. These allegations make it plausible that the "Organic" design is "wholly unnecessary" to the linens' utilitarian function. *See Collezione Europa USA, Inc.*, 618 F.3d at 434 (finding conceptual separability where the designs on furniture were "wholly unnecessary" to the utilitarian function of the furniture). Additionally, the description of "Organic" as a "bold pattern…evocative of tribal and aboriginal works" suggests GT's objective in adding the "Organic" design to the linens was not to improve the linens' utility but instead to "give [the linens] a pretty face." *See id.* (finding a designer's "artistic judgment exercised independently of functional influences" relevant to concluding a design was conceptually separable from the furniture on which it appeared).

Defendants contend the "Organic" design cannot be separated from GT's linens because "the linens' utility is decreased by such a separation; wear, imperfections, and stains are increasingly visible on linens that are more uniform in appearance." Defs.' Mot. 8. This argument, however, is premature. The court finds GT has sufficiently alleged conceptual separability in its Amended Complaint so as to survive defendants' motion to dismiss. Defendants may choose to raise this issue again at the conclusion of discovery through a dispositive motion.

Finally, GT must show it owns the copyright. Copyright "presumptively vest[s] in the author—the one who translates an original idea into a fixed tangible means of expression." *Peiffer*, 21 F.3d at 571. This presumption falls, however, "if the work is made 'for hire,' such as

one 'prepared by an employee within the scope of his or her employment.'" *Id.* Where the work is made for hire, "copyright vests in the employer for whom the work was prepared," unless there is a clear writing reserving authorship rights to the employee. *Id.*

GT has sufficiently alleged ownership. GT claims it created "Organic" in 2007 for use in its high-end linen collection. Am. Compl. ¶ 7. The copyright registration for "Organic" indicates it was a work made for hire. *Id.* at Ex. A. It is irrelevant whether GT itself was the author of the design or the design was made for hire by an employee because, in either scenario, copyright would vest in GT as the author or as the employer for whom the work was prepared. *See Peiffer*, 21 F.3d at 571. Thus, GT's Amended Complaint sufficiently alleges it owns a valid copyright. Accordingly, defendants' motion to dismiss will be denied as to GT's claim for copyright infringement.

## Count II: Impoundment and Destruction

Although GT's Amended Complaint requests impoundment and destruction of defendants' infringing works pursuant to 17 U.S.C. § 503, GT is not at this time seeking an order of impoundment. ECF No. 18, p. 11. If GT does decide to seek impoundment and destruction either during discovery or within a dispositive motion, GT must comply with this court's order governing the filing of motions. ECF No. 6.

## Count III: Unfair Competition – Trade Dress Infringement

Section 43(a) of the Lanham Act "protects against certain deceptive practices," even when there is no trademark involved, including protecting against trade dress infringement. *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir. 1986). To maintain a claim for trade dress infringement, the plaintiff must show three things: "(1) its trade dress is primarily non-functional;" (2) "the trade dress either (a) is inherently distinctive, or (b) has acquired a

secondary meaning;" and (3) "the alleged infringement creates a likelihood of confusion." *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 368 (4th Cir. 1999) (citation omitted).

Trade dress is primarily non-functional if it is not "essential to the use or purpose of the article" and if exclusive use of the trade dress would not "put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995). To establish trade dress has acquired a secondary meaning, the plaintiff must demonstrate that, "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." *Andrews*, 783 F.2d at 449 (citation and internal quotation marks omitted). The plaintiff can carry its burden on both acquisition of secondary meaning and likelihood of confusion by putting forth evidence that the defendant intentionally and directly copied the plaintiff's trade dress. Such evidence "establishes a prima facie case of secondary meaning" and allows courts to "presum[e] a likelihood of confusion." *Andrews*, 783 F.2d at 449; *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 149 (4th Cir. 1998).

GT's allegations in its Amended Complaint are sufficient to state its claim for trade dress infringement. Although defendants argue GT's trade dress is functional and therefore ineligible for trade dress protection, there is no evidence of functionality before the court. GT alleges the design is "non-functional," and its description of the design is more evocative of artwork than function. Am. Compl. ¶¶ 8, 11. As discussed within copyright infringement, defendants' claims about the functionality of the "Organic" design are premature. GT has sufficiently alleged its trade dress is non-functional so as to survive the motion to dismiss stage. GT has also alleged facts sufficient to show secondary meaning and likelihood of confusion. GT claims defendants

9

"directly copied and held out as their own, an exact copy of GT's protected work." *Id.* ¶¶ 38. Evidence of this intentional and direct copying would establish a prima facie case of secondary meaning and allow this court to presume a likelihood of confusion. Thus, the Amended Complaint properly states a claim for trade dress infringement.[4]

### Count IV: Interference with Business Expectancy

Interference with business relationships encompasses two types of tort actions: (1) inducing the breach of an existing contract and (2) wrongful or malicious interference with prospective business relationships. *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 540 (D. Md. 2006). To state a claim for interference with prospective business relationships under Maryland law, the plaintiff must allege four elements:

(1) intentional and willful acts;
(2) calculated to cause damage to the plaintiffs in their lawful business;
(3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and
(4) actual damage and loss resulting.

*K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 973 (Md. 1989) (citations and internal quotation marks omitted). Wrongful or malicious interference is "interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994). Wrongful or unlawful conduct is defined as "wrongful or unlawful acts includ[ing] violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the

---

[4] Defendants also contend GT is not entitled to prevent competitors from selling competing products. This argument is misleading. It is true "§ 43 does not prohibit copying *per se*." *Ashley Furniture Indus., Inc.*, 187 F.3d at 368. However, it does prohibit "a copy that can be passed off as the product of the originator, thereby confusing the consumer and interfering with the originator's rights in the goodwill of its business." *Id.* The complaint alleges defendants directly copied GT's work to "cause the Hotel to believe that the simulated product was identical to GT's…work." Am. Compl. ¶ 40. Under these alleged facts, GT is entitled to prevent defendants from selling copies of its linens.

institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Id.* (quoting *K & K Mgmt.*, 557 A.2d at 979).

To escape liability for this tort, a defendant can rely on the safe harbor of competitive interference, which provides that competition is a just cause "for damaging another in his business." *Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 675-76 (Md. 1984). In determining whether this safe harbor is available to a defendant, Maryland courts look to the guidance provided in the Restatement (Second) of Torts:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
> (a) the relation concerns a matter involved in the competition between the actor and the other and
> (b) the actor does not employ wrongful means
> (c) his action does not create or continue an unlawful restraint of trade and
> (d) his purpose is at least in part to advance his interest in competing with the other.

*Id.* at 676 (quoting Restatement (Second) of Torts, § 768 (1977)).

GT properly states a claim for interference with business expectancy. Because there was no contract between GT and the Hotel, the tort at issue here is wrongful or malicious interference with prospective business relationships. GT claims it was reasonably certain to receive the contract for the linens, but was thwarted only because defendants directly copied GT's linens and offered them to the Hotel at a lower cost. Am. Compl. ¶ 58–59. GT alleges defendants knew of the existence of this business expectancy between GT and the Hotel because the Hotel specifically told defendants GT previously provided to the Hotel samples of its linens, and the Hotel provided those samples to defendants to copy. *Id.* ¶¶ 53–54. Thus, defendants, according to GT, intentionally and willfully interfered with GT's business expectancy. Additionally, GT alleges wrongful or unlawful conduct on the part of defendants because defendants engaged in

11

copyright infringement and trade dress infringement to accomplish their interference. *Id.* ¶¶ 61–63. The allegations of wrongful or unlawful conduct allow GT's claim of wrongful interference to survive the motion to dismiss and prevent defendants from utilizing the competition safe harbor at this stage in the litigation.

<u>Individual Liability of Defendant Campbell</u>

Fourth Circuit case law establishes that, in infringement and unfair trade practices cases, "[a] corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987). Specifically, a corporate officer may be held liable for its corporation's infringement under two theories: (1) contributory infringement and (2) vicarious liability. *See CoStar Grp., Inc.*, 373 F.3d at 549–50. First, the officer can be liable under contributory infringement if the official "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of [the corporation]." *Id.* at 550. Second, the officer can be vicariously liable if the official had "(1) the right and ability to supervise the activity and (2) an obvious and direct financial interest in the exploitation of the copyrighted materials." *Grey Comput.*, 910 F. Supp. 1077, 1090–91 (D. Md. 1995).

GT's Amended Complaint allows the court to reasonably infer that defendant Campbell could be personally liable for the misconduct alleged, either under a theory of contributory infringement or vicarious liability. To establish contributory infringement, GT alleges Campbell personally knew the "Organic" design was protected by GT's copyright, had direct knowledge of the copyright infringement, and materially contributed to the infringement by arranging the direct copying of the design. Am. Compl. ¶ 6. To show vicarious liability, GT alleges Campbell, as an officer of Castello, had both the right and ability to supervise the infringement

and a direct, financial interest in the infringement. *Id.* These facts are sufficient to plausibly allege individual liability on the part of Campbell. Accordingly, defendants' motion to dismiss as to defendant Campbell will be denied.

## **Conclusion**

For the aforementioned reasons, plaintiff GT's complaint properly alleges the essential elements for each of its claims. Thus, defendants Castello's and Campbell's motion to dismiss, ECF No. 17, will be denied. Defense counsel Eric Menhart's Motion to Withdraw his appearance as counsel for Defendants Castello 1935 Inc. and Richard William Campbell, ECF No. 20, will be granted. Defendant Castello must retain counsel as this case proceeds. *McGowan v. Cross*, 991 F.2d 790 (Table), 1993 WL 125416, at *1 n.1 (4th Cir. 1993) ("Corporations and partnerships, as artificial entities, may not appear pro se but must instead appear through counsel."). Defendants will file their answers by June 7, 2018. I will then issue a scheduling order and discovery order and schedule a Federal Rule of Civil Procedure 16 conference.

## **ORDER**

Accordingly, it is this <u>17th</u> day of <u>May</u>, <u>2018</u>, hereby ORDERED that:

1. The Motion to Dismiss, ECF No. 17, IS DENIED;

2. Defense counsel Eric Menhart's request to withdraw his appearance, ECF No. 20, is GRANTED;

3. This case WILL PROCEED with regard to all of Plaintiff's claims; and

4. Defendants SHALL ANSWER the Amended Complaint by June 7, 2018.

                                                      /S/
                                             Paul W. Grimm
                                             United States District Judge